# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

FREDDIE PHILLIPS,                        )
                                         )
                 Plaintiff,              )
                                         )
        v.                               )        No. 4:14 CV 2108 DDN
                                         )
                                         )
CAROLYN W. COLVIN,                       )
Acting Commissioner of Social Security,  )
                                         )
                 Defendant.              )

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security of the application of plaintiff Freddie Phillips for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401, et seq. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the decision of the Administrative Law Judge (ALJ) is affirmed.

## I. BACKGROUND

Plaintiff was born on January 22, 1959. (Tr. 35.) He protectively filed his application for disability insurance benefits on June 24, 2010, alleging an initial onset date of disability of May 1, 2010, subsequently amended to October 17, 2012. (Tr. 11, 75, 116.) He alleged disability due to back problems, abdominal pain, neck pain, vision problems, and memory problems. (Tr. 302.) His application was denied initially, and he requested a hearing before an ALJ. (Tr. 137-41, 144-45.)

On March 14, 2012, following a hearing, the ALJ issued a decision finding that plaintiff was not disabled. (Tr. 116-27.) The Appeals Council granted plaintiff's request for review and remanded to the Agency with instructions to reevaluate his residual

functional capacity and provide a complete opinion regarding his exertional abilities. (Tr. 134-35.)

The ALJ conducted a second hearing, and on September 3, 2013, issued a second decision finding that plaintiff was not disabled. (Tr. 11-23.) The Appeals Council denied plaintiff's request for review. (Tr. 1-3.) Accordingly, the ALJ's September 2013 decision stands as the final decision of the Commissioner.

## II. MEDICAL AND OTHER HISTORY[1]

In May 2010 plaintiff was x-rayed at Christian Hospital for chronic pain in his thoracic spine. Plaintiff reported having prior surgeries on his lumbar spine and right knee. His back surgery occurred in 2005 following an accident. Several doctors reviewed his x-rays. Anjum Shariff, M.D., reported the presence of rods along the left upper paralumbar spine level with associated screws. He noted normal alignment and an absence of fracture or bony destruction. Chandrakant Tailor, M.D., reported a normal thoracic spine. (Tr. 389-401.)

On July 14, 2010, plaintiff was admitted to Christian Northeast Hospital for increasingly worsening left lower extremity pain. The pain originated in his left calf and radiated to the upper posterior thigh. He was diagnosed with below-the-knee deep vein thrombosis or the formation of one or more blood clots (thrombi) in the deep veins, usually of the lower extremity or in the pelvis. Leslie Fields, M.D., noted that plaintiff did not have a sedentary lifestyle and was not significantly overweight. She started him on Coumadin, an anticoagulant. (Tr. 405-06.)

On July 29, 2010, plaintiff saw Jamaluddin Amanullah, M.D., to establish a new primary care physician relationship. On November 8, 2010, plaintiff saw Tony Chien, D.O., an orthopedist, at Dr. Amanullah's request. Plaintiff's chief complaint was pain in

---

[1] The sole basis for the present action is the ALJ's evaluation of plaintiff's physical condition. (Pl.'s Br. at 6-14.) Because plaintiff does not challenge the ALJ's evaluation of his mental impairments, the court will limit its discussion to the issues raised by plaintiff.

the lumbar spine. Plaintiff described an aching pain in his lumbar spine with an intermittent sharp pain. He also reported that the pain radiated into his right buttock and lateral thigh regions, and that he injured himself when he fell off of a roof. Dr. Chien noted plaintiff's remarkable past medical history for deep venous thrombosis, hepatitis C, depression, and back surgery. Dr. Chien recommended spinal steroid injections, and on November 15, 2010, plaintiff received the injections. Following the injections, plaintiff reported an 80% improvement, but stated that the pain moved farther up his back. He was treated with anti-inflammatory medication and muscle relaxants, and instructed not to do any heavy lifting, pushing, or pulling. (Tr. 468-71.)

Between November 12, 2010 and March 18, 2011, plaintiff was seen on three occasions in the Cardiovascular Division at Washington University School of Medicine. His medical history included hypertension, hepatitis C, deep vein thrombosis, and gastroesophageal reflux disease (GERD). Plaintiff complained of shortness of breath and chest discomfort over the past eight to nine months; however prior to that time, he had fairly good exercise capacity. Plaintiff's complaints of chest discomfort and shortness of breath were consistent with coronary artery disease or pulmonary hypertension. He had smoked a pack of cigarettes per day for thirty years. Treating physician Kory Lavine, M.D., recommended an exercise stress echocardiogram, to assess his exercise tolerance and ischemic symptoms; a chest x-ray; a brain natriuretic peptide test, a test to measure the amount of the BNP hormone which is made by the heart and shows how well the heart is working; and a pulmonary CT angiogram. (Tr. 551-52.)

Plaintiff reported significant improvement in his chest pain during a second visit at the Cardiovascular Division on December 17, 2010. Dr. Lavine suspected obesity and deconditioning were causing his shortness of breath. Dr. Lavine described a patient doing fairly well from a cardiovascular perspective, noting that he was able to walk up multiple flights of stairs or several blocks without shortness of breath or chest pain. He states that he occasionally has shortness of breath with significant activity, which is improved when he goes some length of time without smoking. Plaintiff's CT scan was

negative for pulmonary embolism, but showed two intermediate speculated nodules in the right upper lobe. Dr. Lavine ordered follow up in three to six months. (Tr. 583-85.)

On January 5, 2011, plaintiff saw Dr. Amanullah for a progress visit. She indicated that plaintiff's three and one half months of anticoagulation therapy had been effective. He had no further of chest pains or shortness of breath. She noted that plaintiff used a cane for ambulation. (Tr. 476.)

On March 18, 2011, plaintiff was seen again at Washington University School of Medicine. He reported no significant change in his health, but continued to have not particularly intense atypical chest pain that improved after ten to fifteen minutes of activity. Pei-Hsiu Huang, M.D., a cardiologist, noted that plaintiff had slight shortness of breath while working and that he wheezed on occasion. He noted that a CT chest scan from February showed no change in the right upper lobe nodules, but that he was concerned about possible bronchogenic carcinoma. (Tr. 544-46.)

On April 8, 2011, plaintiff saw Dr. Amanullah. Dr. Amanullah noted that his fatigue had improved. He was newly diagnosed with diabetes. He had elevated liver enzymes and therefore was unable to be placed on statins. He had uncontrolled GERD. He was still smoking and was strongly advised to quit. He had been off of his anticoagulation therapy for many months. His prognosis was guarded, and the case was discussed in detail with plaintiff and his wife. (Tr. 514-15.)

On April 12, 2011, plaintiff was treated at the Washington University School of Medicine, Lung Center for his pulmonary nodules. He stated he had had worsening shortness of breath since September 2010. His exercise tolerance decreased slightly from being able to walk four to five miles a day to walking one to two miles. Alexander Chen, M.D., a pulmonologist, noted the nodules were small and had remained stable from November 2010 to February 2011. The nodules were not amenable to biopsy, and Dr. Chen recommended a follow up CT scan in August 2011. He believed that the obstructive lung disease was likely secondary to plaintiff's history of smoking. (Tr. 829-30.)

On May 5, 2011, plaintiff was seen at the Barnes Jewish Hospital Emergency Room (ER) for back pain. He had been prescribed Tramadol, but told the ER nurse that it did not work well and made him sleepy. (Tr. 514, 811.) He stated that the pain in his back had increased over the past two months and had worsened since the evening before around 10:00 P.M. An x-ray showed postoperative changes of instrumented anterior spinal fusion, solid bony fusion, and a normal alignment. He was discharged the same day and instructed to follow up with his primary care physician. (Tr. 808-27.)

One May 20, 2011, plaintiff was seen at the Betty Jean Kerr (BJK) People's Health Center as a new patient. Pamela Buchanan, M.D., family practitioner, noted four areas of focus: hepatitis C; physical therapy for chronic back issues; chronic obstructive pulmonary disease (COPD); and abnormal lipids and glucose. (Tr. 539.) His pain level was 0/10. (Tr. 539-41.)

On May 26, 2011, plaintiff saw Gil Vardi, M.D., a cardiologist, at St. Louis Heart and Vascular, P.C., for shortness of breath and high blood pressure. Plaintiff had chest pain that felt like pressure when resting and during exercise. His physical exam was unremarkable. Dr. Vardi ordered follow up after additional testing. (Tr. 529-31.)

On June 21, 2011, Dr. Vardi saw plaintiff for follow up. A stress test was normal. A Holter monitor, used to monitor the heart, showed bradycardia, abnormally slow heart action, and tachycardia, abnormally rapid heart rate. Dr. Vardi ordered cardiac catheterization and sublingual Nitroglycerin. He diagnosed essential hypertension, or high blood pressure without a known cause, and instructed plaintiff to follow up in six months if he decided not to have cardiac catheterization. (Tr. 526-28.)

The following day plaintiff was seen at BJK People's Health Centers for a follow up for his hypertension. He also complained of dizziness with medication over the past three days. Plaintiff reported pain as 0/10. Dr. Buchanan took plaintiff off Lisinopril, for high blood pressure, for a trial without medication and scheduled follow in one week. (Tr. 537-38.)

Plaintiff was seen by Mary DiGregorio, nurse practitioner, on September 21, 2011, at BJK People's Health Centers for follow up. Ms. DiGregorio noted that plaintiff had

leg pain, which began three years ago, occurs constantly and was worsening. His symptoms included decreased mobility, limping, nocturnal awakening, nocturnal pain, and swelling. The leg pain was aggravated by movement or standing and was relieved by prescription medication, but not by rest. Ms. DiGregorio noted plaintiff's hypertension and that he was no longer on medication after Dr. Buchanan stopped it two months ago. Plaintiff reported pain 8/10. He was to follow up in two to three weeks. (Tr. 610-13.)

On October 6, 2011, plaintiff saw Dr. Buchanan for follow up, reporting pain of 7/10. (Tr. 606-09.)

On October 9, 2011, plaintiff was seen in the ER at Christian Hospital Northeast for low back and neck pain after a motor vehicle accident. He was given Toradol, a nonsteroidal anti-inflammation injection, and diagnosed with a lumbosacral strain and neck strains. He was discharged and instructed to follow up with his primary care physician. (Tr. 640-46.)

On October 24, 2011, Sarwath Bhattacharya, M.D., conducted a physical examination of plaintiff and completed a Medical Source Statement (MSS). Dr. Bhattacharya's clinical impression was chronic low back pain with mild tenderness on the right side. She believed that plaintiff could sit for three hours, stand for 30 minutes, or walk for two hours without interruption during an eight-hour work day. He would be able to sit for the rest of the eight hours. He could frequently reach in all directions, handle objects, push/pull, use fingers, and feel. Plaintiff could occasionally climb stairs and ramps, balance, stoop, kneel, crouch, crawl, but never climb ladders or scaffolds. Dr. Bhattacharya indicated that plaintiff was relatively independent. Among other things, he was able to travel without a companion for assistance, walk a block at a reasonable pace, use public transportation, climb a few steps at a reasonable pace, prepare a simple meal, and care for personal hygiene. (Tr. 587-98.)

Plaintiff underwent a psychological evaluation on October 24, 2011 by Lloyd Irwin Moore, Ph.D., for a determination of possible disability. Regarding functional limitations, Dr. Moore opined that plaintiff was moderately impaired in activities of daily living, social functioning, and concentration, persistence, and pace. He believed that

plaintiff had a moderate ability to respond to instructions and to deal with the public despite his impairments. (Tr. 576-86.)

On December 1, 2011, plaintiff saw Dr. Vardi at St. Louis Heart and Vascular. Plaintiff continued to have chest pain symptoms and had missed five appointments for cardiac catheterization. Dr. Vardi recommended plaintiff limit his sodium intake, lose weight, continue to monitor blood pressure at home, undergo complete blood work, and start or continue a regular exercise program. (Tr. 1014-15.)

On December 27, 2011, plaintiff underwent a cardiac catheterization which showed no evidence of hemodynamically significant fixed obstructive coronary artery disease; mild hypokinesis (abnormally diminished muscular function or mobility) of the anterior apex; and a normal aortofemoral. (Tr. 655-58.)

From January 30 to February 17, 2012, plaintiff was hospitalized at Christian Hospital after being seen in the ER with complaints of dizziness. He was given the anticoagulants Lovenox and Coumadin, and discharged in satisfactory condition. (Tr. 659-61.) While hospitalized, plaintiff was treated by Gary R. Goldstein, M.D., a pulmonary specialist. A CT scan revealed a pulmonary embolism that was markedly positive, and a right upper lobe nodule. Since the nodule had increased, Dr. Goldstein recommended continued treatment with anticoagulation therapy. (Tr. 667-68.) On discharge, plaintiff's dizziness had been resolved. His discharge diagnosis noted he was currently undergoing therapy for his chronic hepatitis C. He was further diagnosed with acute pulmonary embolus, acute deep venous thrombosis, chronic obstructive pulmonary disease, tobacco abuse, and affective disorder. (Tr. 660-61.)

On March 3, 2012, plaintiff reported to the ER at Christian Hospital with complaints of pain and swelling in his right leg over the past five days. An ultrasound revealed acute to possibly subacute venous thrombosis in the left leg, chronic deep vein thrombosis in one of the left peroneal veins, but no evidence of any deep vein thrombosis in the right lower extremity. Akinrinola Fatoki, M.D., diagnosed acute deep vein thrombosis in the left lower extremity. He indicated that plaintiff's compliance with his medication might be poor and stressed the importance of compliance. (Tr. 684-94.)

Plaintiff was hospitalized at Christian Hospital from April 5-16, 2012, for complaints of bilateral lower extremity pain. An ultrasound showed deep vein thrombosis in both lower extremities. The thrombosis in the left lower extremity was free floating. A lumbar spine x-ray revealed previous postoperative changes in his upper lumbar spine, but was otherwise unchanged from an earlier x-ray from May 2011. An inferior vena cava filter (IVC filter) was implanted to prevent a pulmonary embolism. In his discharge summary, Dr. Spezia noted plaintiff had been noncompliant with his anticoagulation therapy. (Tr. 695-711.)

On July 10, 2012, plaintiff saw David Rex Curfman, M.D., a neurologist, for a consultation for tremors in his hands. Plaintiff reported daily tobacco use, but was receiving intervention and counseling on cessation of tobacco use. He also reported shortness of breath after walking three steps and that he was unable to walk a block without shortness of breath. He reported difficulty falling asleep and was only able to sleep for two hours. Plaintiff further reported increasing difficulty remembering words and conversation. His recall and memory were 3/3. His strength was 5/5. Plaintiff was able to walk on his heels and toes with a normal gait and stance. He had a full range of motion in his back without tenderness. Dr. Curfman prescribed Propranolol, a beta blocker, for his tremor, and scheduled follow up in three months. (Tr. 770-74.)

Plaintiff saw Dr. Spezia on October 17, 2012, for bilateral leg swelling. Plaintiff reported noncompliance with his Coumadin. Dr. Spezia indicated plaintiff had a normal range of motion in his neck, and thoracic and lumbar spine. There was no evidence of muscle spasms in plaintiff's spine. Dr. Spezia diagnosed chronic deep vein thrombosis and noncompliance with Coumadin. (Tr. 896-98.)

Plaintiff saw Dr. Vardi on October 25, 2012 for swelling in his legs. An ultrasound showed chronic deep vein thrombosis in both legs. Dr. Vardi again recommended limiting daily sodium intake, losing weight, continuing to check blood pressure at home, complete blood work, and starting or continuing a regular exercise program. (Tr. 1002-03.)

On November 1, 2012, plaintiff saw Dr. Curfman for follow up for his tremors. Plaintiff reported that although his tremors had improved, he still noticed them and they continued to interfere with his ability to eat, drink, and perform other tasks. Dr. Curfman increased his Propranolol and ordered follow up in three months. (Tr. 763-66.)

An echocardiogram taken November 8, 2012 revealed a normal left ventricle, mild enlargement of the left atrium, mild valve regurgitation, mild tricuspid regurgitation with a right ventricular systolic pressure within normal limits, normal aortic root size, and normal pericardium with no pericardial or pleural effusion. (Tr. 631-32.)

Plaintiff underwent surgery on December 12, 2012 at Barnes-Jewish Hospital by Traves D. Crabtree, M.D., to remove bilateral pulmonary nodules on his lung. The surgery was successful in removing the lung cancer. (Tr. 858-59.) Plaintiff reported doing well in follow-up with Dr. Crabtree on December 27, 2012. Dr. Crabtree believed plaintiff would not require additional chemotherapy, but might require further surgery. (Tr. 931.)

On January 18, 2013, plaintiff saw Dr. Spezia. Dr. Spezia indicated plaintiff had a normal range of motion in his neck, and thoracic and lumbar spine. There was no evidence of muscle spasms in plaintiff's spine. Dr. Spezia diagnosed recurrent deep vein thrombosis in the lower extremities. (Tr. 901-03.)

On January 24, 2013, a CT scan of plaintiff's lung showed no interval change in the lung nodule. (Tr. 742-44.) He was recovering nicely but continued to smoke one to two cigarettes per day. (Tr. 933.)

On February 2, 2013, Dr. Spezia completed a Medical Source Statement. He opined that plaintiff would be limited to occasionally lifting or carrying up to 20 pounds, and frequently lifting or carrying up to ten pounds. Plaintiff could sit for a total of three hours, stand for up to two hours, and walk for up to one hour in an eight-hour workday. Plaintiff would spend the other two hours lying down resting. Plaintiff could occasionally use foot controls with either foot. Plaintiff would be unable to climb stairs or ramps, balance, stoop, or kneel. Plaintiff should not travel without a companion and could not walk a block at a reasonable pace. (Tr. 887-94.)

Plaintiff saw Dr. Spezia on February 20, 2013 for a comprehensive exam. Plaintiff complained of pain in his back right shoulder, leg swelling, and bilateral ankle swelling. Unlike previous reports, Dr. Spezia indicated an abnormal range of motion in the neck and lumbar spine. He diagnosed plaintiff with recurrent deep vein thrombosis, thoracic and lumbar somatic dysfunction, essential hypertension, and status post IVC filter. (Tr. 904-06.)

On March 11, 2013, plaintiff saw Dr. Spezia for a consultation. Dr. Spezia indicated plaintiff had a normal range of motion in his neck, and thoracic and lumbar spine. There was no evidence of muscle spasms in plaintiff's spine. Dr. Spezia's impression was stable deep vein thrombosis and that he needed continued anticoagulation therapy. Dr. Spezia also noted that plaintiff was currently unable to be employed or look for work due to his current medical condition. (Tr. 908-10.)

During an April 11, 2013 visit with Dr. Spezia, plaintiff was doing well on his medications and needed refills on his analgesics. Plaintiff reported leg pain over the previous two weeks. Dr. Spezia noted a 1+ pretibial pitting edema or swelling. Dr. Spezia indicated plaintiff had a normal range of motion in his neck, and thoracic and lumbar spine. There was no evidence of muscle spasms in plaintiff's spine. He diagnosed post deep venous thrombosis of the lower extremities and post pulmonary embolus. (Tr. 911-13.)

On April 18, 2013, plaintiff was seen as an outpatient at Barnes-Jewish Hospital for follow up on his tremor. Plaintiff reported that the tremor no longer interfered with his activities as he eats and drinks without issue, and no longer drops things. On examination, plaintiff's strength was 5/5 throughout. He was diagnosed with atypical chest pain, chronic hepatitis C, pulmonary nodules, essential hypertension, benign tremor, lower back pain, pulmonary disease, and depression. (Tr. 736-40.)

At a follow-up appointment with Dr. Crabtree on April 25, 2013, plaintiff reported doing very well and denied any pain, cough, or hemoptysis. Plaintiff also denied any shortness of breath while resting, but that he gets short of breath after walking long

distances or up stairs.  Dr. Crabtree did not see any new lung nodules or lesions that would be a concern for metastatic disease.  Plaintiff continued to smoke.  (Tr. 920.)

On May 1, 2013, plaintiff complained to Dr. Spezia of bilateral lower extremity pain, generally at rest, or sometimes with increased activity.  Plaintiff had a normal range of motion in his neck, and thoracic and lumbar spine.  The report also indicated there was no evidence of muscle spasms in plaintiff's spine.  Dr. Spezia did, however, indicate abnormal range of motion in plaintiff's extremities.  Dr. Spezia diagnosed peripheral neuropathy and recurrent deep vein thrombosis.  He ordered a bilateral lower extremity arterial Doppler study, used to measure the amount of blood flow through arteries and veins.  This study revealed no significant stenotic disease or narrowing in the major arteries of the lower extremities.  (Tr. 914-18.)

### ALJ Hearing

The ALJ conducted a hearing on July 17, 2013.  Plaintiff, represented by counsel, testified to the following.  He was born on January 22, 1959 and was 54 years old.  He completed the eleventh grade and does not have his GED.  He last worked in February 2012 at Star Bedding as a packer but was terminated twice because he was late to work and was accused of falling asleep on the job, which he denies.  He worked at Stellar Manufacturing in 2002 packing tablets and clothing for swimming pools and at Figure Craft Products in 2000 grinding concrete sculptures.  He has not worked since December 31, 2012 due to his back problems and difficulty lifting.  He was unable to find work thorough an agency due to his back problems.  He does not perform household chores, yard work, or pursue any hobbies.  (Tr. 76-83.)

Vocational Expert Dale Thomas also appeared and testified to the following.  The ALJ asked the VE to assume a person of plaintiff's age, education and past work experience.  The hypothetical individual was capable of performing light work.  The individual could sit for three hours at a time and six hours in a work day; stand for two hours at a time and four hours in a work day; and walk for one hour total in an eight-hour workday.  The individual could only occasionally reach overhead, frequently reach in all

other directions, and occasionally push and pull with both upper extremities. The individual could occasionally operate foot controls with both lower extremities; occasionally climb stairs and ramps, but could never climb ladders or scaffolds. The individual could occasionally balance, stoop, and kneel, but could never crouch and crawl. The individual could have no exposure to unprotected heights and unprotected moving parts. He could occasionally operate a motor vehicle and have occasional exposure to humidity and wetness, dust, odors, fumes and other pulmonary irritants, extreme cold, extreme heat, and vibration. The VE testified that such a claimant would be limited to unskilled light level production work, including electronics worker, packer, hand packager, and cashier. (Tr. 86-89.)

The VE further testified that if the individual were limited to performing simple, repetitive tasks with only occasional contact with supervisors, coworkers and the public, the cashier job would be eliminated. He testified that if the individual could work only six hours at a time, he would be unable to perform full time work. Finally, the VE testified that if the hypothetical individual needed to elevate his feet to knee level, those jobs would be eliminated. (Tr. 89-91.)

### III. DECISION OF THE ALJ

On remand, the ALJ was instructed to reevaluate plaintiff's residual functional capacity and provide a complete opinion regarding his exertional abilities. The ALJ found that plaintiff retained the residual functional capacity to perform light work as defined in the regulations, except that he was limited to three hours of prolonged sitting and a total of six hours sitting in an 8-hour workday. He was limited to standing/walking for two hours at a time and four hours in an 8-hour workday. The ALJ further found that plaintiff's ability to perform prolonged walking was limited to one hour in an 8-hour workday. He could occasionally reach overhead and frequently reach in all other directions with both upper extremities. Plaintiff could never crawl or climb ladders, ropes, or scaffolds, but could occasionally climb stairs and ramps, push and pull with both upper extremities, operate foot controls with lower extremities, balance, stoop, and

kneel.  Additionally, the ALJ determined that plaintiff could occasionally operate a motor vehicle, but needed to avoid exposure to unprotected heights, moving mechanical parts, humidity/wetness, dust, odors, fumes and other pulmonary irritants, extreme heat, extreme cold, and vibration.  (Tr. 15-16.)

To account for plaintiff's mental impairments, the ALJ limited plaintiff to work that involved understanding, remembering, and carrying out simple repetitive tasks.   The ALJ determined that plaintiff could tolerate occasional interaction with supervisors, co-workers, and the public.  (Tr. 15.)

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Id.  In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision.  Id.  As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently.  See Krogmeir v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires, 564 F.3d at 942.  A five-step regulatory framework is used to determine whether an individual is disabled.  20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three required plaintiff to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his condition meets or equals a listed impairment. 20 C.F.R. § 416.920(a)(4)(i)-(iii). If plaintiff is not currently working, has a severe impairment, but does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether or not plaintiff retains the residual functional capacity to perform past relevant work. Pate-Fires, 564 F.3d at 942. If, as here, the Commissioner determines plaintiff cannot return to past relevant work, the burden shifts to the Commissioner at Step Five to show plaintiff retains the residual functional capacity to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 416.920(a)(4)(v).

## V. DISCUSSION

Plaintiff argues that the ALJ erred in failing to consider (1) the issue of failure to follow prescribed treatment; (2) whether plaintiff was justified in not following prescribed treatment; and (3) in giving controlling weight to Dr. Spezia's opinion. This court disagrees.

### 1.      Residual Functional Capacity

The court concludes the ALJ performed a proper credibility analysis in determining plaintiff's residual functional capacity. Residual functional capacity "is what a claimant can do despite his limitations, and it must be determined on the basis of all relevant evidence, including medical records, physician's opinions, and claimant's description of his limitations." Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001); 20 C.F.R § 404.1545(a)(1). The ALJ determines residual functional capacity by considering the effect of all limitations, combined, using all relevant evidence, including medical records, observations of treating physicians, as well as the claimant's own complaints. See McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000). A treating physician's opinion is given controlling weight if supported by objective evidence in the

record. 20 C.F.R. § 404.1527(d)(2); see Turpin v. Colvin, 750 F.3d 989, 993 (8th Cir. 2014).

In this case the ALJ considered the record as a whole, including plaintiff's testimony, the treatment records, and medical opinion evidence. See Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001) (before determining claimant's RFC, the ALJ first must evaluate the claimant's credibility). After considering all of the evidence, the ALJ found that plaintiff's subjective allegations of disabling impairments were not entirely credible and discussed a number of inconsistencies in support of his finding. (Tr. 16-22.) See Gregg v. Barnhart, 354 F.3d 710, 713 (8th Cir. 2003) ("If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination.").

The ALJ acknowledged that plaintiff experienced some limitations from his mental and physical impairments, including depression, anxiety, borderline intellectual functioning, degenerative disc disease with radiculopathy, hepatitis C, and chronic deep vein thrombosis. However, the ALJ determined that the record evidence did not corroborate the severity of plaintiff's alleged symptoms. Nor did the objective medical evidence support plaintiff's claims of disabling limitations. (Tr. 13-22.)

Objective medical evidence, or lack thereof, is an important factor to consider in determining credibility. See 20 C.F.R. § 404.1529(c)(2) (objective medical evidence is a useful indicator in making reasonable conclusions about the intensity and persistence of a claimant's symptoms and the effect those symptoms may have on a claimant's ability to work). The ALJ acknowledged that plaintiff was diagnosed with degenerative disc disease with radiculopathy and deep vein thrombosis and that plaintiff underwent lumbar fusion surgery in 2005 following a work injury. (Tr. 13, 18, 60.) However, plaintiff's physical examinations during the relevant time period were consistently unremarkable. Specifically, plaintiff had some swelling in his legs, but otherwise had normal strength in all extremities without evidence of atrophy or abnormal movements, full range of motion in his back without tenderness or spasms, normal coordination, intact cranial nerves, intact sensation, normal reflexes, negative straight leg raises, and a normal gait. (Tr. 16,

620, 625-26, 663, 665, 668, 688, 739-40, 765, 773-74, 799, 810, 812, 830, 856, 897, 900, 902, 905-06, 909-10, 912, 915-16, 945, 951, 964, 968, 1006.) Such findings do not support plaintiff's claims of disabling physical impairments. Cf. Flynn v. Astrue, 513 F.3d 788, 793 (8th Cir. 2008) (holding that physicians' observations that claimant had normal muscle strength and mobility constituted medical evidence supporting the ALJ's conclusion that the claimant could lift 20 pounds occasionally and 10 pounds frequently).

Likewise, diagnostic test results showed evidence of degenerative disc disease, but were otherwise unremarkable. (Tr. 708, 814-16, 941.) For instance, an x-ray of plaintiff's back dated May 2011 showed postoperative changes with normal alignment, no evidence of instrumentation failure, and normal disc spaces at unfused levels. (Tr. 814-16.) An x-ray approximately one year later was similarly unremarkable with evidence of previously described postoperative changes in the upper lumbar spine, but no evidence of fracture or dislocation or other defects. (Tr. 708, 941.) Given the benign physical examination findings and unremarkable diagnostic test results, the ALJ lawfully determined that the objective medical evidence did not support plaintiff's claims of disabling back problems.

The ALJ noted that plaintiff's conditions improved with medication. (Tr. 16, 20.) See Wildman v. Astrue, 596 F.3d 956, 965 (8th Cir. 2010) (as a general matter, impairments that can be controlled by treatment or medication are not disabling.) The ALJ acknowledged that plaintiff received treatment for tremors. (Tr. 20, 738, 741, 763-65, 772-74, 1004-07.) However, his condition improved with treatment; he reported that he felt the tremor no longer interfered with his activities and he was able to eat and drink without issue and no longer dropped things. (Tr. 20, 738, 740.) Therefore, the ALJ lawfully found that plaintiff's improvement with treatment suggested that his tremors were not disabling. (Tr. 16, 20.)

The ALJ also noted that plaintiff had not been compliant with medication; specifically, the record evidence showed that plaintiff did not take his Coumadin as prescribed by his doctor. (Tr. 17, 19, 698, 700, 898, 935.) See Holley v. Massanari, 253

F.3d 1088, 1092 (8th Cir. 2001) (noncompliance with recommended treatment can be a factor in the credibility analysis).

      **2.      Failure to Follow Prescribed Treatment - Social Security Ruling 82-59**

Plaintiff argues the ALJ erred in discounting his subjective complaints regarding his physical problems due to his noncompliance. He argues the ALJ failed to consider the necessary criteria set forth in Social Security Ruling 82-59 for finding that he failed to follow prescribed treatment. He argues that the ALJ failed to determine whether compliance with the recommended treatment--which she failed to identify--would clearly restore plaintiff's ability to do work. He argues that when the Commissioner identifies "failure" as an issue, SSR 82-59 requires the Commissioner to determine whether the "failure" was justifiable, such as when the claimant cannot afford said treatment or the treatment is contrary to his religious beliefs. This court disagrees.

Plaintiff's argument ignores the distinction between evidence of noncompliance as a credibility factor and the failure to follow prescribed treatment under Social Security Ruling 82-59. The Social Security Administration allows an ALJ to deny a claimant's case if compliance with prescribed treatment would restore the claimant's ability to work. Social Security Ruling 82-59 explains that a claimant with (1) a disabling impairment which (2) is amenable to treatment (3) that could be expected to restore the ability to work must follow the (4) prescribed treatment to be found disabled unless (5) there is a justifiable cause for the failure to follow such treatment. Social Security Ruling 82-59 "only applies to claimants who would otherwise be disabled within the meaning of the Act." See Owens v. Astrue, 551 F.3d 792, 800-02, n. 3 (8th Cir. 2008).

In this case, SSR 82-59 does not apply because the ALJ considered plaintiff's noncompliance for purposes of determining the credibility of his subjective allegations--not for the purpose of evaluating his disability. (Tr. 17, 19.) Thus, contrary to plaintiff's assertion, the ALJ lawfully determined that plaintiff's noncompliance with medication, was one of several factors that undermined the credibility of his subjective complaints. (Tr. 17, 19.) See Holley, 253 F.3d at 1092. Accordingly, in light of the ALJ's other

stated reasons for discounting plaintiff's credibility, this argument will be disregarded. See Rueckert v. Colvin, No. 14-6029-CV-ODS-SSA, 2014 WL 6471892, at *3 (W.D. Mo. Nov. 18, 2014) (ALJ's credibility finding was supported by substantial evidence because it included "numerous other reasons" for discounting the claimant's credibility). As discussed above, the ALJ properly considered plaintiff's allegations of disability but articulated several valid reasons for finding his allegations not credible. (Tr. 16-22.) Because the ALJ pointed to substantial evidence in the record supporting each rationale, the court will defer to the ALJ's credibility finding. See Baldwin v. Barnhart, 349 F.3d 549, 558 (8th Cir. 2003) (questions regarding claimant's subjective testimony are primarily for the ALJ to decide, not the courts).

3. **Opinion of Treating Physician Michael J. Spezia, D.O.**

Plaintiff next argues the ALJ erred in failing to give controlling weight to the opinion of his primary care physician, Dr. Michael Spezia. The court disagrees.

Opinions from medical sources that have treated a claimant typically receive more weight than opinions from one-time examiners or non-examining sources. See 20 C.F.R. § 416.927(c)(1)-(2). However, the rule is not absolute; a treating physician's opinion may be disregarded in favor of other opinions if it does not find support in the record. See Casey v. Astrue, 503 F.3d 687, 692 (8th Cir. 2007). Ultimately, it is up to the ALJ to determine the weight each medical opinion is due. Hacker v. Barnhart, 459 F.3d 934, 935, 939 (8th Cir. 2006).

In this case, the ALJ lawfully considered the opinion of Dr. Spezia. In July 2013 Dr. Spezia completed a Medical Source Statement addressing plaintiff's ability to do work-related physical activities. (Tr. 888-94.) In it he noted that plaintiff experienced chronic pain in his upper extremities and deep vein thrombosis in his lower extremities. Dr. Spezia opined that plaintiff could frequently lift and carry up to 10 pounds; occasionally lift and carry 11-20 pounds; sit continuously for 3 hours for a total of 3 hours in an 8-hour workday; stand for 2 hours continuously for a total of 2 hours in an 8-hour workday; and walk for 1 hour at a time without interruption. He also believed that

plaintiff needed to spend the remaining hours in an 8-hour workday lying down resting with feet and legs elevated. Dr. Spezia further noted that plaintiff could occasionally reach overhead, and could frequently reach in all other directions. He could occasionally push/pull and had no difficulty handling, fingering, or feeling. Plaintiff was limited to occasional operation of foot controls due to his chronic deep vein thrombosis. He could occasionally balance, stoop, kneel, and climb ladders and stairs, but could never climb ladders or scaffolds, crouch, or crawl. Plaintiff could not be exposed to unprotected heights or moving mechanical parts. He could occasionally operate a motor vehicle and be exposed to humidity and wetness; dust, odors, fumes, and other pulmonary irritants; extreme cold; extreme heat; vibrations; and noise. Dr. Spezia opined that plaintiff could not travel without a companion or assistance, nor could he walk a block at a reasonable pace on rough or uneven surfaces. He also determined that plaintiff could shop, walk without an assistive device, climb a few steps at a reasonable pace with the use of a handrail, prepare simple meals, attend to his personal care, and handle objects. Lastly, Dr. Spezia noted that plaintiff's limitations began on October 17, 2012. (Tr. 889-93.)

The ALJ considered Dr. Spezia's opinion and gave it little weight because many of Dr. Spezia's findings were inconsistent with the objective medical evidence, including his own contemporaneous treatment notes. See Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) ("If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight."). In particular, the ALJ noted that Dr. Spezia's findings regarding plaintiff's physical limitations were inconsistent with the largely unremarkable physical examination findings discussed above, such as full strength in all extremities, full range of motion in his back without tenderness or spasms, normal coordination, intact cranial nerves, intact sensation, normal reflexes, negative straight leg raises, and a normal gait (Tr. 16, 21-22, 620, 625-26, 663, 665, 668, 688, 739-40, 765, 773-74, 799, 810, 812, 830, 856, 897, 900, 902, 905-06, 909-10, 912, 915-16, 945, 951, 964, 968, 1006.) The ALJ concluded that such evidence did not support the extreme limitations that Dr. Spezia included in his July 2013 Medical Source Statement. (Tr. 21-22.)

In addition, Dr. Spezia's opinion that plaintiff needed to lie down and elevate his legs during the day, that he was unable to travel without a companion, or walk a block at a reasonable pace on rough or uneven terrain, were inconsistent with his own treatment notes inasmuch that he never proscribed such limitations. (Tr. 21, 896-1030.) See Davidson v. Astrue, 578 F.3d 838, 842 (8th Cir. 2009). Rather, the only mention of these limitations is in Dr. Spezia's July 2013 Medical Source Statement--nearly 18 months after the relevant time period. (Tr. 889, 893.)

An ALJ is permitted to give less weight to a physician's opinion when the physician makes extreme findings that are inconsistent with the objective evidence of record. See Halverson v. Astrue, 600 F.3d 922, 930 (8th Cir. 2010) (affirming ALJ's rejection of claimant's argument she was unable to work even though multiple examinations showed no abnormalities). Additionally, the court finds significant the fact that plaintiff was instructed by his doctors to exercise despite his complaints of a disabling physical condition because it suggests that plaintiff's condition was not as severe as he alleged. (Tr. 16, 628, 1001, 1003, 1015.) See Hacker v. Barnhart, 459 F.3d 934, 938 (8th Cir. 2006) (ALJ did not err when he found that a treating physician's opinion concerning a claimant's "intolerance for even minor physical exertion was inconsistent with his frequent admonition that she should exercise more often.").

Further, Dr. Spezia's records do not show that he ever imposed any physical limitations or work restrictions on plaintiff. (Tr. 660-63, 696-99, 896-1030.) See Fischer v. Barnhart, 56 F. App'x 746, 748 (8th Cir. 2003) (ALJ properly noted that treating physician never recommended any work restrictions in discounting that physician's opinion); Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996) (lack of significant restrictions imposed by treating physicians supported the ALJ's decision of no disability).

To the extent plaintiff is arguing that the ALJ's evaluation of Dr. Spezia's opinion is error because it was the only medical opinion of record, this argument fails. The ALJ is the fact-finder, and is alone charged with weighing the evidence and reaching conclusions based on the evidence she finds credible for legally supportable reasons. See Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011) (ALJ is not required to rely entirely

on a particular physician's opinion or choose between the opinions of any of the claimant's physicians). The ALJ fulfilled this duty and determined plaintiff's residual functional capacity based on all of the evidence, including Dr. Spezia's opinion. <u>See</u> <u>Ellis v. Barnhart</u>, 392 F.3d 988, 999 (8th Cir. 2005) (while medical source opinions are considered in assessing residual functional capacity, the final determination of residual functional capacity is left to the Commissioner).

This court also notes that the ALJ did not reject Dr. Spezia's opinion in its entirety, and in fact incorporated several of his opinions into her residual functional capacity assessment. The ALJ credited Dr. Spezia's findings regarding plaintiff's ability to lift and carry up to 10 pounds frequently and 11-20 pounds occasionally by limiting him to "light" work, which involves lifting no more than 20 pounds at time and frequent lifting or carrying of objects weighing 10 pounds. (Tr. 15, 888.) <u>See</u> 20 C.F.R. § 404.1567(b); SSR 83-10. The ALJ also credited Dr. Spezia's opinion regarding plaintiff's ability to sit, stand, walk, reach, push, pull, climb, balance, stoop, kneel, and crawl, in addition to environmental limitations. (Tr. 15, 889-92.) Thus, while the ALJ ultimately determined that Dr. Spezia's opinion was not entitled to significant weight, she included many limitations in her residual functional capacity finding that reflected Dr. Spezia's findings. Accordingly, this court concludes the ALJ committed no error on this point.

## VI. CONCLUSION

For all of the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith.

_____S/   David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**

Signed on January 12, 2016.